**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br>　　　　Plaintiff/Counterdefendant,<br><br>v.<br><br>COWBOY ATHLETICS, INC. and<br>T. BOONE PICKENS,<br>　　　　Defendants/Counterclaimants/<br>　　　　Third-Party Plaintiffs,<br><br>v.<br><br>MANAGEMENT COMPENSATION<br>GROUP ● LEE INC.; JOHN RIDINGS<br>LEE; JOHN RIDINGS LEE COMPANY<br>INC.; JAMES GLENN TURNER, JR.;<br>LARRY ANDERS; SUMMIT ALLIANCE<br>FINANCIAL, L.L.P.,<br>　　　　Third-Party Defendants. | C.A. NO. 3:10-CV-173-P |

**BRIEF IN SUPPORT OF OPPOSITION OF THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT
OF COWBOY ATHLETICS, INC. ON ITS BREACH OF CONTRACT
COUNTERCLAIM AND THE MOTION FOR SUMMARY JUDGMENT OF COWBOY
ATHLETICS, INC. AND T. BOONE PICKENS ON THE AMENDED COMPLAINT OF
THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND FACTS ..................................................................................... 1

II.  ARGUMENT AND AUTHORITIES ............................................................................ 2

    A.  Disputed issues of material fact concerning delivery of the Policies preclude summary judgment on Cowboy's breach of contract counterclaim........ 2

    B.  Disputed issues of material fact preclude any finding that Lee was Lincoln's agent for all purposes surrounding delivery of the Policies ................. 6

    C.  The undisputed facts establish that constructive delivery of the Policies occurred in 2007 and that Cowboy waived any claim that Lincoln failed to deliver the Policies in 2007 .................................................................................... 9

    D.  Cowboy is estopped from claiming non-delivery in 2007, the right to a free-look period in 2009, or concealment of the Policies by Lincoln................. 13

    E.  Cowboy is not entitled to summary judgment on Lincoln's breach of contract claim ..................................................................................................... 15

    F.  Pickens is not entitled to summary judgment on Lincoln's tortious interference claim against him ........................................................................... 18

    G.  Cowboy is not entitled to summary judgment on Lincoln's declaratory judgment claim..................................................................................................... 23

III.  CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atlin v. Mendes*, No. 3:06-CV-1909-L, 2008 U.S. Dist. LEXIS 105066 (N.D. Tex. Dec. 31, 2008).................................................................................................2

*Bauer v. Texas*, 341 F.3d 352 (5th Cir. Tex. 2003) ..........................................24

*Dealer Express Mktg., L.L.C. v. Autodealer Express, L.L.C.*, No. CIV-08-1186-D, 2010 U.S. Dist. LEXIS 27714 (W.D. Okla. Mar. 24, 2010)........................15

*Essex Ins. Co. v. Redtail Products, Inc.*, No. 3:97-CV-2120-D, 1999 U.S. Dist. LEXIS 12829 (N.D. Tex. Aug. 17, 1999) ......................................................8

*Jackson v. Farmers New World Life Ins. Co.*, No. CIV-08-384-SPS, 2010 U.S. Dist. LEXIS 28810 (E.D. Okla. Mar. 24, 2010) ..........................................13

*Jobri, L.L.C. v. Select Comfort Corp.*, No. CIV-09-296-KEW, 2010 U.S. Dist. LEXIS 107632 (E.D. Okla. Oct. 7, 2010)....................................................16

*Markel Service, Inc. v. National Farm Lines*, 426 F.2d 1123 (10th Cir. 1970)..................7

*Prusky v. Prudential Ins. Co. of America*, No. 00-2783, 2001 U.S. Dist. LEXIS 24080 (E.D. Pa. Oct. 30, 2001)....................................................................12

*Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272 (N.D. Okla. 2006) .........................................................................................10, 12, 13

*Southern Farm Bureau Cas. Ins. Co. v. Allen*, 388 F.2d 126 (5th Cir. 1967) ...................8

*United States Fid. & Guar. Co. v. Oklahoma*, 383 F.2d 417 (10th Cir. 1967) ..................8

*Wagnon v. State Farm Fire & Casualty Co.*, 146 F.3d 764 (10th Cir. Okla. 1998)..........13

## STATE CASES

*Aetna Casualty & Sur. Co. of Hartford, Conn. v. Local Building & Loan Association*, 19 P.2d 612 (Okla. 1933) ....................................................................8, 9

*Allen & Scott v. Stahl*, 75 P.2d 204 (Okla. 1938) .............................................9

*Arabesque Studios, Inc. v. Academy of Fine Arts, International, Inc.*, 529 S.W.2d 564 (Tex. Civ. App. 1975) ...........................................................................8

*Cendant Mobility Servs. Corp. v. Falconer*, 135 S.W.3d 349 (Tex. App. Texarkana 2004) ...................................................................................14

*City Nat'l Bank and Trust Co. v. Jackson Nat'l Life Insurance*, 804 P.2d 463 (Okla. Civ. App. 1990) ...........................................................8

*Commonwealth Life Ins. Co. v. Hutson*, 271 P.2d 722 (Okla. 1954) ..................8

*El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616 (Tex. App. Houston 2003)..........................................................................16

*Fitzgerald v. Illinois Life Insurance Co.*, 37 P.2d 952 (Okla. 1934) .................17

*Georgia Home Insurance Co., Columbus, Ga. v. Choctaw Cotton Oil Co.*, 5 P.2d 152 (Okla. 1931) ..........................................................................7

*Globe & Rutgers Fire Ins. Co. v. Roysden*, 258 P.2d 644 (Okla. 1953)............7

*Gunter Hotel of San Antonio, Inc. v. Buck*, 775 S.W.2d 689 (Tex. App. San Antonio 1989)..........................................................................15

*Howard v. Burlington Ins. Co.*, 347 S.W.3d 783 (Tex. App. Dallas 2011) ............... 13-14

*In re Texas Association of Sch. Boards, Inc.*, 169 S.W.3d 653 (Tex. 2005) ...................16

*Ins. Co. of North America v. Burton*, 294 P. 796 (Okla. 1930) ........................7

*Isenhower v. Isenhower*, 666 P.2d 238 (Okla. Ct. App. 1983) ..........................12

*Judd v. Lubbock Mut. Aid Assoc.*, 269 S.W. 284 (Tex. Civ. App. 1925) ...........8

*Liverpool & L. & G. Ins. Co. v. T. M. Richardson Lumber Co.*, 69 P. 936 (Okla. 1902) ...............................................................................13

*McFarling v. Demco, Inc.*, 546 P.2d 625 (Okla. 1976) ....................................7

*McNabb v. Kentucky Central Life Ins. Co.*, 631 S.W.2d 253 (Tex. Civ. App. 1982) ................................................................................8, 9

*Mid-Continent Life Insurance Co. v. Dees*, 269 P.2d 322 (Okla. 1954)............9

*Murray v. Crest Construction*, 900 S.W.2d 342 (Tex. 1995) ..........................16

*Northwestern Mut. Ins. Co. v. Richardson*, 470 P.2d 330 (Okla. 1970) ...........8

*Occidental Life Ins. Co. v. Minton*, 73 P.2d 440 (Okla. 1937) ........................17

ii

*Oklahoma Aid Assoc. v. Pecinosky*, 30 P.2d 167 (Okla. 1934) ...........................................8

*Orix Capital Markets v. Wash. Mut. Bank*, 260 S.W.3d 620 (Tex. App. Dallas 2008) ...........................................................................................................................15

*Powell Industrial, Inc. v. Allen*, 985 S.W.2d 455 (Tex. 1998) .........................................19

*Seelbach v. Clubb*, 7 S.W.3d 749 (Tex. App. Texarkana 1999)................................18, 19

*Standard Life & Accident Ins. Co. v. Cornelius*, 340 P.2d 478 (Okla. 1959).....................7

## FEDERAL STATUTES

28 U.S.C. § 2201-2202 .....................................................................................................24

## STATE STATUTES

OKLA. STAT. tit. 36 § 1435 ............................................................................................. 6-7

OKLA. STAT. tit. 36 § 4001 ...............................................................................................11

OKLA. STAT. tit. 36 § 4003 ...........................................................................................11, 12

OKLA. STAT. tit. 36 § 4101 ........................................................................................... 11-12

## MISCELLANEOUS

5 COUCH ON INSURANCE 3d § 79:7....................................................................................17

44 AM. JUR. 2d INSURANCE § 915 ...................................................................................17

## I.    INTRODUCTION AND FACTS[1]

Cowboy Athletics, Inc. ("Cowboy") seeks summary judgment on its counterclaim for breach of contract as well as Lincoln's breach of contract claim, arguing there are no disputed issues of fact and that all parties agree the Policies were not actually delivered to Cowboy in 2007.  This position is false.  Indeed, in its motion for partial summary judgment, Lincoln demonstrates (and Cowboy cannot dispute) that Cowboy has told different stories about how the Policies were delivered.  While Lincoln may, of course, assume for purposes of its motion for summary judgment that Cowboy's current story is true, Cowboy cannot.  Thus, because Cowboy's own conflicting stories create a genuine factual dispute whether actual delivery of the Policies occurred in 2007, Cowboy's motion for summary judgment as to its counterclaim for breach of contract and Lincoln's claim for breach of contract must be denied.

Cowboy also argues that Lincoln's breach of contract claim fails because Lincoln has not demonstrated any damages suffered because of a contractual breach by Cowboy.  Cowboy argues that Lincoln's claim for tortious interference with contract against T. Boone Pickens ("Pickens") fails for the same reasons.  However, Cowboy overlooks the law concerning both of these claims and ignores a number of factual issues that preclude summary judgment.  Finally, Cowboy makes a bizarre argument that Lincoln's declaratory judgment claim, through which it seeks a ruling that the Policies are valid and enforceable, is somehow an improper claim simply because Cowboy has raised its own counterclaims.

None of Cowboy's arguments have traction and its motion for summary judgment should be denied.

---

[1] Lincoln incorporates herein by reference its summary of undisputed material facts contained in its motion for partial summary judgment (D.E. 160).

**Brief in Support of Opposition to Cowboy's and Pickens' Motion for Summary Judgment – Page 1**

## II.     ARGUMENT AND AUTHORITIES

### A.     Disputed issues of material fact concerning delivery of the Policies preclude summary judgment on Cowboy's breach of contract counterclaim.

Cowboy's breach of contract claim is predicated entirely on the basis that the Policies were not delivered to Cowboy's offices in 2007, and that Cowboy did not take delivery until February 2009 and then timely acted on its ten-day right to examine period. However, Cowboy's own conflicting stories about delivery create disputed issues of fact. Indeed, based on Cowboy's documents and testimony, a jury could easily conclude that Cowboy took delivery of the Policies in 2007, either because the jury believes what Cowboy admitted 27 times in the Receipts Mike Holder ("Holder") signed in 2007, or because the jury believes Holder instructed John Lee ("Lee") to maintain physical possession of the Policies on Cowboy's behalf. *See* App'x, pp. 3-29, Receipts; *see also* App'x, p. 496, Lee Dep., p. 111:10-13. Cowboy seems to believe that its signed Receipts and admissions therein should simply be ignored, and that there will be no issue of credibility as to Holder and other witnesses. Cowboy is wrong. *Atlin v. Mendes*, No. 3:06-CV-1909-L, 2008 U.S. Dist. LEXIS 105066 (N.D. Tex. Dec. 31, 2008) (credibility of witnesses creates a factual issue that precludes summary judgment).

Cowboy tells two very different stories concerning delivery. The first is told by the 27 Receipts signed in 2007 by Holder, Cowboy's president. In the Receipts – which are the only writings evidencing what transpired with delivery in 2007 – Holder "acknowledge[d] physical receipt and acceptance of th[e] Polic[ies]" and stated that he understood "there is a period of time in which to thoroughly examine the Polic[ies]" and that Cowboy could return the Policies for a refund by "no later than the last day of the 'right to examine' period as described in the Polic[ies]." *See* App'x, pp. 3-29, Receipts. Thus, according to Cowboy's admissions in the Receipts, it took actual delivery of the Policies in 2007 and its right to examine expired ten days

thereafter, and a jury could clearly reach this conclusion based on the signed Receipts and its view of the credibility of Holder and others.

Cowboy's second story – which is the one advanced by Cowboy in this litigation – surfaced in April 2009, when Holder and Cowboy first claimed their representations in the Receipts were false and that actual delivery had not occurred in 2007.  *See* App'x, p. 1, correspondence dated April 3, 2009.  Cowboy asserts that Lincoln sent the Policies to Anders and Lee, but instead of actually delivering the Policies to Cowboy, Lee retained possession until Cowboy requested the Policies in 2009, thus giving Cowboy more than two years to act on its ten-day right to examine period.  *See* Ctrclm., D.E. 44, ¶30.  Holder testified during his deposition that his statements in the Receipts were false, Cowboy knew Lee's office had retained the Policies, and Cowboy never asked to see the Policies.  *See* App'x, pp. 51, 54-55, Holder Dep., pp. 374:14-21, 379:17-380:1.  Nonetheless, Holder believed that if he had asked for the Policies prior to March 2009, Lee would have provided them to Cowboy, and also that the Policies were in-force once he signed the Receipts, regardless of whether Cowboy ever saw the Policies.  *See* App'x, pp. 49, 54-55, Holder Dep., pp. 232:15-23, 379:3-11, 380:2-6.  Thus, even assuming Cowboy is able to present this argument, a jury could find that Holder is not credible and that actual delivery of the Policies occurred in 2007.

Lee's testimony puts a twist on both of Cowboy's stories.  He testified that Cowboy did not want to take actual physical possession of the Policies.  *See* App'x, p. 496, Lee Dep., p. 111:10-13.  Lee claims that he called Holder and inquired whether Holder wanted Lee to maintain the Policies for Cowboy or if Holder wanted the Policies in Cowboy's office.  *See* App'x, pp. 43-44, 496, Holder Dep., pp. 180:15-181:3, Lee Dep., p. 111:4-22.  Holder instructed Lee to retain the Policies because they contain personal information about the insureds that

Cowboy did not want on its premises.  *See* App'x, pp. 498-499, Lee Dep., pp. 124:25-125:16. Thus, Lee's position is that he was acting on behalf of Cowboy and with the knowledge and direction of Holder, and that he retained physical possession as Cowboy's agent.  Although Lee concedes that neither he nor Holder told Lincoln what they now claim transpired (instead leaving Lincoln to believe that delivery had occurred per the Receipts), he nonetheless maintains that actual delivery of the Policies occurred in 2007 and that the Receipts were filled out properly because, among other things, Holder gave Lee permission to retain the Policies and thus it was, in Lee's view, correct to inform Lincoln that Cowboy had received the Policies and that they were being retained by Cowboy.  *See* App'x, pp. 496-497, Lee Dep., pp. 111:10-13, 113:13-16. Obviously, a jury could believe Lee and find that even if Cowboy did not directly take possession of the Policies in 2007, it did, in fact, take actual delivery in 2007 through Lee.

Cowboy conveniently overlooks these varying facts and wrongly claims it is undisputed that delivery did not occur in 2007.  In short, a jury faced with deciding this issue could reasonably reach the conclusion that delivery actually occurred in 2007, either as stated in the Receipts or via Lee, as Cowboy's agent.  Accordingly, while Lincoln is entitled to assume for purposes of its summary judgment motion that Cowboy's current story is true, Cowboy must live with its prior admissions and is not entitled to summary judgment on its breach of contract claim.

Seemingly recognizing that it cannot quiet these factual disputes, Cowboy attempts to side-step the issue by claiming Lincoln somehow admitted that actual delivery did not occur and that only actual delivery could have started the running of Cowboy's ten-day right to examine period.  Given Holder's signed receipts and Lincoln's lack of personal knowledge as to exactly what transpired with delivery, Lincoln has not, of course, ever conceded that actual delivery failed to occur or that Cowboy had more than ten days to act on its free-look period.

To confuse this issue, Cowboy twists the testimony of Helena Roberts, one of Lincoln's corporate designees, and contends it is undisputed that:

- the Policies require physical delivery to commence the running of the ten-day free-look period; and

- because the ten-day period does not commence until physical delivery of a policy, Lincoln does not allow any exception to physical delivery and requires the selling agent to return a completed Delivery Receipt form only when physical delivery has occurred.

However, Ms. Roberts testified merely that the signing of a policy delivery receipt triggers the free-look period, and that the delivery receipt is the manner in which Lincoln confirms the policy was delivered to the owner.  *See* App'x, p. 504, Roberts Dep., p. 199:2-5. Here, Holder signed a Receipt for each of the 27 Policies, and this triggered the free-look period. *See* App'x, pp. 3-29, Receipts.  Further, she testified that based on Holder's signed Receipts, Lincoln believed the Policies were delivered to Cowboy in February and March 2007.  *See* App'x, pp. 80-81, Roberts Dep., pp. 130:20-131:10.  Moreover, Harold D. Skipper, Lincoln's insurance expert[2] rebuts Cowboy's claim that the 10-day right to examine had not expired when Cowboy attempted to cancel the 27 Policies in April 2009.  *See* App'x, pp. 505-562, Skipper Expert Report.  In support of his expert opinion that the right to examine period expired 10 days after Holder signed the policy delivery receipts in 2007, Mr. Skipper points out that:

- it is standard insurance industry practice for an insurance company like Lincoln to rely upon delivery receipts executed by the policy owner to verify delivery of policies;

- Holder signed all 27 Receipts on the date shown on those documents;

---

[2] Professor Skipper, who earned his Ph.D. from the Wharton School at the University of Pennsylvania, is Professor Emeritus at Georgia State University and a leading expert in insurance theory and practice.  Skipper co-authored the leading university-level textbook on life insurance and has served as a consultant on various insurance matters for numerous organizations.

- Holder verified in the Receipts that the policies had been delivered to, and accepted by, Cowboy and that the Policies were being physically maintained by Cowboy;

- by acknowledging receipt and acceptance of the Policies in the Receipts, Cowboy placed Lincoln on the risk for each of the policies; and

- for two years after the Receipts were signed and submitted to Lincoln, Cowboy treated the Policies as being in-force by paying premiums due in the amount of over $16 million each year, showing financial transactions regarding the Policies on its books and taking no actions inconsistent with its belief that the Policies were, in fact, in-force.

*See* App'x, pp. 525-532, 533-534, H. Skipper Report, ¶¶ 82-113, 120-125.  Accordingly, no matter how Cowboy wants to twist the facts, it cannot escape the disputed issues created by its own conflicting stories.

**B.      Disputed issues of material fact preclude any finding that Lee was Lincoln's agent for all purposes surrounding delivery of the Policies.**

Cowboy gives cursory treatment to whether Lee's obligation to deliver the Policies is imputed to Lincoln, and has failed to establish that no genuine issue of material fact exists with regard to whether Lee was acting as Lincoln's agent.  Cowboy simply states that it "was Lincoln's duty to physically deliver the Policies and its delegation of that duty to Lee means that Lincoln is fully responsible for Lee's acts," and that Lee's status as a producing agent for Lincoln provides an independent basis for Lincoln's responsibility for his malfeasance.  *See* Cowboy's Brief, D.E. 166, p. 16.

Cowboy cites to Section 1435.3(A) of the Oklahoma Insurance Code and seems to suggest, without analysis, that this statute is the final word on the issue of whether Lee was Lincoln's agent for all purposes surrounding delivery.  The statute provides:

> [e]very insurance producer…who solicits or negotiates an application for insurance of any kind shall, in any controversy between the insured or the insured's beneficiary and the insurer,

> be regarded as representing the insurer and not the insured or the
> insured's beneficiary.

OKLA. STAT. tit. 36, § 1435.3(A).  Courts have applied this statute only in limited situations to preclude an insurer from declining coverage where its agent makes representations to an insured concerning coverage.  *See, e.g.*, *Globe & Rutgers Fire Ins. Co. v. Roysden*, 258 P.2d 644 (Okla. 1953) (insurer bound where agent accepted premium and waived coverage limitation).  The statute is not meant to impute all acts of a so-called agent to the insurer.  *See, e.g.*, *Standard Life & Accident Ins. Co. v. Cornelius*, 340 P.2d 478 (Okla. 1959) ("A soliciting agent is merely a special agent, and . . . ordinarily he has no authority to bind [the insurer] by attempted acts or contracts in its behalf, relating not to the taking of the application, but to the subsequent contract of insurance ….); *see also Markel Service, Inc. v. Nat'l Farm Lines*, 426 F.2d 1123 (10th Cir. 1970) (insurance agent was an agent of the insured in receiving and transferring premium payments); *Ins. Co. of North America v. Burton*, 294 P. 796 (Okla. 1930) (holding that the existence of the statute stating that "'any person who shall solicit and procure an application for insurance in all matters relating to such application and the policy issued in consequence thereof shall be regarded as the agent of the insurer and not the insured,' does not preclude such person from acting as the agent of the insured in certain particulars and in a proper case"); *Georgia Home Ins. Co., Columbus, Ga. v. Choctaw Cotton Oil Co.*, 5 P.2d 152 (Okla. 1931) (citing to *Burton* and holding that producer was legally allowed to act as agent for the insured).

        Further, Oklahoma courts have consistently acknowledged that the agency of a broker is a question of fact.  *McFarling v. Demco, Inc.*, 546 P.2d 625 (Okla. 1976) ("It is a factual question as to whether a broker is the agent of the insured or of the insurer, and will be resolved according to the circumstances of each particular case" and as "[the insurer] was one of many insurance companies [the broker] could have chosen. . . [the broker] would act in a dual capacity

as agent and independent contractor for each."); *City Nat'l Bank and Trust Co. v. Jackson Nat'l Life Ins.*, 804 P.2d 463 (Okla. Civ. App. 1990) (acknowledging that "there is also authority for the proposition that agency presents a question of fact for jury determination. . . .").[3]

Here, Cowboy relies on facts that are, on their face, disputed, in order to arrive at the conclusion that Lincoln was complicit in Cowboy's own misrepresentations. *See, e.g.*, Cowboy's Brief, p. 17 ("Lincoln did not follow its own rules here because of the amount of money involved. . . . Lincoln made the financial decision to retain the money. . .). In addition to the existence of factual issues concerning agency in general, an insurance broker's alleged misconduct cannot be imputed to an insurance company where the broker is alleged to have defrauded the insurance company in connection with the issuance of the policies at issue. *See United States Fid. & Guar. Co. v. Oklahoma*, 383 F.2d 417, 419 (10th Cir. 1967) (applying Oklahoma law); *Southern Farm Bureau Cas. Ins. Co. v. Allen*, 388 F.2d 126 (5th Cir. 1967) (applying Texas law).[4] Where the conduct of an agent is such that he is "acting in his own business or for his own personal interest and adversely to the principal, or for any other reason has a motive or interest in concealing the facts from his principal," there is a "well-established exception to the general rule that the knowledge of an agent is to be imputed to the principal."

---

[3] The cases cited by Cowboy are inapposite. *Northwestern Mut. Ins. Co. v. Richardson* stands for the proposition only that a "soliciting agent of insurer is insurer's agent in *taking applications*," which Lincoln has not disputed. 470 P.2d 330, 333-334 (Okla. 1970) (emphasis added). *Commonwealth Life Ins. Co. v. Hutson* likewise addresses the soliciting agent in the context of "taking applications." 271 P.2d 722, 724 (Okla. 1954). The law in Texas regarding the agency of a broker is the same as that in Oklahoma; namely, that an insurance agent may be considered the agent of both the insurer and the insured. In *Essex Ins. Co. v. Redtail Products, Inc.*, for example, the insurer sought declaratory judgment that it had no duty to defend the insured under a commercial general liability policy in a trademark infringement suit. No. 3:97-CV-2120-D, 1999 U.S. Dist. LEXIS 12829 (N.D. Tex. Aug. 17, 1999). The insured counterclaimed for fraud in the inducement and declaration that the insurer was bound by the agent's knowledge, among other claims. The court found that the insurance agent was the agent of the insured and, as such, there could be no fraud in the inducement.

[4] *See also Allen & Scott v. Stahl*, 75 P.2d 204, 207 (Okla. 1938); *Oklahoma Aid Ass'n v. Pecinosky*, 30 P.2d 167, 169 (Okla. 1934); *Aetna Cas. & Sur. Co. of Hartford, Conn. v. Local Bldg. & Loan Ass'n*, 19 P.2d 612, 618 (Okla. 1933); *accord Arabesque Studios, Inc. v. Acad. of Fine Arts, Int'l, Inc.*, 529 S.W.2d 564, 568 (Tex. Civ. App. 1975); *McNabb v. Kentucky Central Life Ins. Co.*, 631 S.W.2d 253, 255-256 (Tex. Civ. App. 1982); *Judd v. Lubbock Mut. Aid Ass'n*, 269 S.W. 284 (Tex. Civ. App. 1925).

**Brief in Support of Opposition to Cowboy's and Pickens' Motion for Summary Judgment – Page 8**

*Allen & Scott*, 75 P.2d at 207; *see also Aetna*, 19 P.2d at 618 (Okla. 1933) (bank agent's

knowledge of embezzlement not imputed to defendant bank); *McNabb*, 631 S.W.2d at 255

("knowledge of an insurance agent will not be imputed to the insurance company where the

agent is acting fraudulently and collusively for his own interest").

Cowboy admits in its motion, and the record is undisputed, that Lincoln did not learn of

the circumstances surrounding delivery of the Policies until 2009. *See* Cowboy's Brief, p. 17.

Further, Cowboy itself argues that Lee did not comply with Lincoln's guidelines regarding

delivery. *Id*. Moreover, in its counterclaim, Cowboy alleges that Lee made false representations

to Lincoln concerning the Policies and how they were delivered. *See* Ctrclm., ¶27. Thus, it is at

least a disputed fact whether Lee acted adversely to Lincoln, and for his own interest, when Lee

(as Cowboy argues) failed to comply with Lincoln's guidelines.

> **C.**     **The undisputed facts establish that constructive delivery of the Policies**
> **occurred in 2007 and that Cowboy waived any claim that Lincoln failed to**
> **deliver the Policies in 2007.**

Contrary to Cowboy's argument, this Court already established as the law of this case

that actual physical delivery of the Policies was not required in order to trigger all rights and

obligations under the Policies. *See* Order, D.E. 72, pp. 8-9 (citing *Mid-Continent Life Ins. Co. v.*

*Dees*, 269 P.2d 322, 323 (Okla. 1954) (constructive delivery of policy occurs and binds the

parties where policy is sent to the broker and the owner pays premium, actual physical receipt of

policy by the owner is not required)).  Thus, Cowboy is incorrect when it argues that the Policies

themselves required physical delivery to commence the ten-day right to examine period.  Instead,

under Oklahoma law, constructive delivery would be sufficient.  Moreover, it is undisputed that

the existence of the right to examine period was revealed to Holder in the Receipts themselves,

and thus there is no basis for Cowboy to argue that it needed the Policies in order to act upon this

right in 2007. *See* App'x, pp. 3-29, Receipts.  Thus, as set forth in Lincoln's motion, even

assuming Cowboy's current delivery story is true, constructive delivery occurred as a matter of law in 2007 when Holder signed a Receipt for each of the 27 Policies.

Furthermore, because Oklahoma law does not mandate physical delivery in order for an insurance policy to become binding on the contracting parties, either party can waive physical delivery yet bind itself to the contract.  Thus, Cowboy's actions in signing the Receipts, and thereafter treating the Policies as valid for more than two years, constitutes waiver of any claim that the Policies were not delivered in 2007, that Cowboy had a ten-day free-look period available in 2009, or that Lincoln concealed the Policies.  *See Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272, 1282 (N.D. Okla. 2006) (judgment as a matter of law to insurer where insured charged with knowledge of policy).

Cowboy nonetheless argues (without any support) that its ten-day right to examine the Policies cannot be waived as a matter of law, and that the free-look period could not begin until Cowboy had physical possession of the Policies.  *See* Cowboy's Brief, pp. 19-21.  This argument is flawed for several reasons.  First, Lincoln does not contend that Cowboy waived its free-look period.  Instead, as Cowboy concedes, Lincoln argues that Cowboy waived any claim of failed delivery, meaning Cowboy is precluded from claiming that the Policies were not delivered in 2007, that it had a ten-day free-look period available in 2009, or that Lincoln concealed the Policies.

To be clear, Lincoln admits each of the Policies contained a ten-day free-look period and that Cowboy had that period available to it in 2007.  Lincoln's position is simply that the period expired by its own terms approximately two years before Cowboy sought to invoke its rights. Lincoln's position concerning waiver is not that Cowboy waived its rights under the free-look provision, but instead that Cowboy waived its ability to attempt to claim non-delivery of the

Policies, and thus bootstrap a claim that it now has the right to assert the free-look provision when such provision terminated, by its own terms, years ago.

Second, Cowboy's position obviously conflicts with the law of this case and the finding that Oklahoma law does not mandate actual delivery of insurance policies.  Because constructive delivery is sufficient to trigger coverage and all rights and duties under a policy, Cowboy's argument is simply wrong.

Third, Cowboy argues that the free-look provision in the Policies was mandated by Oklahoma statute but fails to establish that the Policies are even controlled by the statute upon which it relies.  To that end, although Cowboy cites Section 4003.1 of the Oklahoma Insurance Code, which provides that any "policy of individual life insurance" must include a ten-day free-look period, Cowboy has not established that the Policies are "individual life insurance" such that Section 4003.1 controls.  OKLA. STAT. tit. 36 § 4003.1.

Here, it is undisputed that the Policies were issued to Cowboy, as the owner, on the basis that Cowboy represented itself as a valid charitable institution.  *See* App'x, pp. 563-567, Cowboy Certificate of Incorporation.  Accordingly, the Policies are more appropriately classified as group life insurance contracts controlled by Section 4101 of the Oklahoma Insurance Code.  That statute defines group insurance as, among other things, "[a] policy issued to a charitable, benevolent, educational or religious institution, or their agencies, to insure the members thereof for the purpose set forth in subsection D of Section 3604 of this title," which is precisely what these Policies are.  OKLA. STAT. tit. 36 § 4101.  And, contrary to Cowboy's arguments, the Insurance Code expressly states that there is no statutory requirement to include a ten-day free-look period in any group life insurance contract.  *See* OKLA. STAT. tit. 36 § 4001 ("This article applies to contracts of life insurance and annuities, other than reinsurance, group life insurance,

group annuities, and industrial life insurance; except that Section 2 of this act (Return of policy within ten (10) days) …of this article shall apply to industrial life insurance also.").

Therefore, while Cowboy argues that Lincoln had a statutory obligation to provide a free-look period, it has failed to come forth with undisputed evidence supporting this claim.  Instead, although Lincoln included a free-look period in the Policies, this was purely a matter of private contract between Lincoln and Cowboy.  Thus, even if Lincoln was asserting that the free-look provision itself was waived, Cowboy admits that a contractually-created right can be waived.

Finally, even if the Court was to conclude that Section 4003.1 applies to the Policies, this statute says nothing about the manner in which a policy should be delivered, does not require actual physical delivery to a policy owner in order to trigger the free-look period, and thus offers no support for Cowboy's argument that the "physical delivery under a free-look provision" cannot be waived.[5]  Instead, the statute simply provides:

> No policy of individual life insurance or any annuity shall be delivered or issued for delivery in this state unless it shall have printed thereon or attached thereto a notice stating in substance that, during a period of ten (10) days from the date the policy or annuity is delivered to the insured, it may be surrendered to the insurer together with a written request for cancellation of the policy or annuity and, in such event, the policy or annuity shall be void from the beginning and the insurer will refund any premium or moneys paid therefor within thirty (30) days from the date of cancellation . . . .

OKLA. STAT. tit. 36 § 4003.1.

---

[5] Cowboy fails to cite even a single case suggesting that Section 4003.1 is applicable to the Policies or that it provides an unwaivable requirement of actual physical delivery.  Instead, Cowboy cites a case from the Eastern District of Pennsylvania applying Pennsylvania law on a tangential issue.  *See Prusky v. Prudential Ins. Co. of Am.*, No. 00-2783, 2001 U.S. Dist. LEXIS 24080 (E.D. Pa. Oct. 30, 2001) (where parties agreed on date owner received policy, that was the date of contract formation).  Cowboy also relies on inapplicable cases having nothing at all to do with life insurance or delivery of an insurance policy.  *See, e.g., Isenhower v. Isenhower*, 666 P.2d 238 (Okla. Ct. App. 1983) ("[A]greements that payments in lieu of property division are terminable upon the contingency of remarriage contravene public policy . . . and cannot be waived.").

Accordingly, under the facts of this case and as more fully addressed in Lincoln's motion, Cowboy's own actions preclude any assertion that the Policies were not delivered in 2007, that Cowboy had a ten-day free-look period available in 2009, or that Lincoln concealed the Policies.

> **D.** **Cowboy is estopped from claiming non-delivery in 2007, the right to a free-look period in 2009, or concealment of the Policies by Lincoln.**

As set forth in Lincoln's motion, under Oklahoma law, as the applicant for and owner of the Policies, Cowboy was obligated to provide Lincoln with truthful information, and this duty runs from the submission of an application and lasts through the making of a claim for policy proceeds.  *See, e.g.*, *Jackson v. Farmers New World Life Ins. Co.*, No. CIV-08-384-SPS, 2010 U.S. Dist. LEXIS 28810, at *10 (E.D. Okla. Mar. 24, 2010) (granting summary judgment to insurer where insured submitted knowingly false information on application, holding intent to deceive insurer established as a matter of law where that is the "only reasonable inference that can be drawn from the surrounding facts."); *Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764, 769 (10th Cir. Okla. 1998) (In connection with an insurance claim, the policy owner is "bound to answer truly every question put to him that was relevant to that inquiry [and] [h]is answer to every question pertinent to that point was material.").

Moreover, the law is clear that one has a duty to read what he signs, and where one provides written acknowledgement of the receipt of a contract, he cannot be heard to later complain that receipt did not occur or that facts within the contract were concealed.  Indeed, it is the law in both Oklahoma and Texas that "insureds have a duty 'to examine, read, and know the contents of the policy before accepting and paying the premium therefor, and, having failed or neglected to do so[, they are] estopped from denying knowledge of its terms or conditions.'" *Slover*, 443 F. Supp. 2d at 1283 (finding estoppel as a matter of law) (quoting *Liverpool & L. & G. Ins. Co. v. T.M. Richardson Lumber Co.*, 69 P. 936, 937 (Okla. 1902)); *see also Howard v.*

*Burlington Ins. Co.*, 347 S.W.3d 783, 792 (Tex. App. Dallas 2011) (granting summary judgment to insurer because "insured is bound to the terms of the policy whether he reads it or not."); *Cendant Mobility Servs. Corp. v. Falconer*, 135 S.W.3d 349, 354-55 (Tex. App. Texarkana 2004) ("The failure of one party to read a contract, or any of the materials appertaining to it, however, does not equate with a failure of the other party to disclose the information contained within the four corners of that contract.").

Despite the well-settled controlling law on this issue, Cowboy argues that estoppel cannot apply and that Holder is excused from what he and Cowboy now claim were misrepresentations by him in the Receipts because he simply followed Lee's instructions. *See* Cowboy's Brief, pp. 21-23. Thus, Cowboy argues, because Lee knew the information in the Receipts was false, and because Lee was Lincoln's agent, Lincoln also knew the Policies had not actually been delivered. *Id.*, p. 22. This argument is nonsense.

First, and most importantly, even under Cowboy's version of the facts, Holder admits the Receipts contained false information when he signed them, and thus that he knew his various representations to Lincoln were false when made. *See* App'x, p. 51, Holder Dep., p. 374:14-21. Second, it is undisputed that Lincoln's intention was for Lee to make physical delivery of the Policies to Cowboy. Third, it is undisputed that Lincoln had *no knowledge* that actual physical delivery of the Policies had not occurred as represented by Holder when he signed the Receipts. *See* App'x, pp. 80-81, 83, Roberts Dep., pp. 130:20-131:10, 178:7-14. Indeed, the uncontroverted evidence is that, after receiving Holder's signed Receipts, Lincoln treated the Policies as valid: it accepted premium payments from Cowboy in 2007 and 2008, and it administered the Policies, including issuing annual Policy statements that were received by Cowboy in 2007 and 2008. *See* App'x, pp. 173-396, Annual Statements. And Lincoln first

learned of any issue surrounding delivery in April 2009. *See* App'x, p. 1, correspondence dated April 3, 2009.

Fourth, as discussed above, Cowboy's argument that Lee's knowledge (assuming, of course, one was to find that delivery did not occur as Holder originally stated in the Receipts) is also Lincoln's knowledge, is wrong. In any event, even assuming Lee was acting as Lincoln's agent, this does nothing at all to prevent the Court from finding as a matter of law that Cowboy is estopped from claiming a lack of delivery in 2007. Indeed, as a matter of Oklahoma law, Cowboy was obligated to provide truthful information in the Receipts and, in turn, Lincoln was entitled to rely upon that information. Holder and Cowboy now claim Holder's admissions in the Receipts were false. By lying in the Receipts, he and Cowboy caused Lincoln to be ignorant of the truth and thus lulled Lincoln into not taking additional steps to ensure the Policies were physically delivered to Cowboy. Thus, and as more fully addressed in Lincoln's motion, these undisputed facts estop Cowboy from claiming that the Policies were not delivered in 2007; that a ten-day free-look period was available in 2009; or that Lincoln concealed the Policies.

**E.    Cowboy is not entitled to summary judgment on Lincoln's breach of contract claim.**

Under both Oklahoma and Texas law, "a successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach." *Orix Capital Mkts. v. Wash. Mut. Bank*, 260 S.W.3d 620, 623 (Tex. App. Dallas 2008); *see also Dealer Express Mktg., L.L.C. v. Autodealer Express, L.L.C.*, No. CIV-08-1186-D, 2010 U.S. Dist. LEXIS 27714 (W.D. Okla. Mar. 24, 2010). Moreover, the "improper termination of a contract is a breach of contract as a matter of law." *Gunter Hotel of San Antonio, Inc. v. Buck*, 775 S.W.2d 689, 697 (Tex. App. San Antonio 1989).

Similarly, an anticipatory breach of contract occurs when a party repudiates the contract in a manner that "amounts to a tender of breach of the entire contract and allows the injured party to immediately pursue an action for damages." *Murray v. Crest Constr.*, 900 S.W.2d 342, 344 (Tex. 1995); *see also El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App. Houston 2003) (Anticipatory repudiation occurs when a party to a contract "absolutely and unconditionally refuse[s] to perform the contract without just excuse."); *Jobri, L.L.C. v. Select Comfort Corp.*, No. CIV-09-296-KEW, 2010 U.S. Dist. LEXIS 107632, at *2 (E.D. Okla. Oct. 7, 2010) ("If the termination of a contract was wrongful – that is, the termination was in contravention of the terms of the contract, it would constitute an anticipatory repudiation.").

It is the law in Oklahoma and Texas – as in other jurisdictions – that, absent a statutory or contract provision to the contrary, an insured is not entitled to unilaterally cancel an insurance policy and demand the return of premium once the risk has attached. *See In re Tex. Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 658-659 (Tex. 2005) ("once risk has attached premiums have been earned and are non-returnable, absent a statutory or contract provision to the contrary");[6] *see also*

---

[6]    In *In re Tex. Ass'n of Sch. Bds., Inc.*, the Texas Supreme Court elaborated on this principle as follows:

> An insurance agreement, like the coverage agreement at issue in this case, is an aleatory contract; that is, a contract in which a promise is conditioned on the happening of a fortuitous event, an event of chance. "The payment of the premium by the insured and the assumption of a specified risk by the insurer are the essential elements of the contract of insurance. The payment . . . [of] premiums is the consideration for which the insurer agrees to assume the risk specified in the policy." In an insurance arrangement, the insurer is not promising to compensate the insured for an actual, expensive loss in exchange for the relatively small, individual premium paid by the insured. Rather, the insurer is assuming the risk that death or property loss may occur in exchange for the premium payment. Moreover, the parties contemplate that the insured will perform his promise to pay premiums even though the condition to the duty of the insured never occurs. A life insurance contract in the amount of a million dollars must be performed though the insured is struck by lightning and dies after paying only one relatively small premium. Similarly, a homeowner who has paid fire insurance premiums for a lifetime cannot reclaim those premiums because no fire occurred. In fact, both parties hope that the condition will never occur. "It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks

*Occidental Life Ins. Co. v. Minton*, 73 P.2d 440, 443 (Okla. 1937) (denying request for return of premium on valid life insurance policy, holding "[w]hen the risk once attached there was a detriment to the promisee and the whole premium was deemed to be earned."); *Fitzgerald v. Illinois Life Ins. Co.*, 37 P.2d 952, 953 (Okla. 1934) (sustaining trial court judgment that plaintiff insured was estopped from seeking recovery of life insurance premiums paid "after having received, accepted, and retained the life insurance policies in question."); 5 COUCH ON INSURANCE 3d § 79:7 ("As a general rule, in the absence of a statutory provision or an express or implied agreement to the contrary, an insured may not have any part of his or her premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned.  This rule is based upon just and equitable principles, for the insurer has, by taking upon itself the peril, become entitled to the premium."); 44 AM. JUR. 2d INSURANCE § 915 (same).

Here, as set forth above and in Lincoln's motion, Cowboy had no contractual or statutory right in 2009 to demand that Lincoln cancel the Policies and return the premiums paid.  Indeed, Holder even testified that once he signed the Receipts in 2007, he understood the Policies were in force and that if an insured died, Lincoln would be obligated to pay the proceeds of the Policy to Cowboy.  *See* App'x, pp. 54, 72-73, Holder Dep., pp. 379:3-11, 516:24-517:9.  Clearly, Cowboy admits Lincoln was on the risk yet it sought to anticipatorily repudiate, and thus breach,

---

so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it."  The foundation of insurance is therefore risk distribution, and premiums are a function of calculated risk.  As a result, there is no premium due until risk attaches, and once risk has attached premiums have been earned and are non-returnable, absent a statutory or contract provision to the contrary.  Similarly, if risk has never attached because an insurance policy was void *ab initio*, the insured is entitled to a return of all premiums paid.  Thus, the consideration to be valued is the undertaking of the risk that insured losses might occur."

169 S.W.3d 653, 658-659 (Tex. 2005).

the Policies by claiming entitlement to a long-expired free-look period.  Cowboy tries to argue around this by suggesting that all it did was to *request* that Lincoln cancel the Policies.  *See* Cowboy's Brief, p. 23.  This argument is remarkable.  Cowboy's position was far more than a simple request – Cowboy threatened litigation with Lincoln, entered into a tolling agreement, and filed a lawsuit in Oklahoma state court on the same day Lincoln commenced this action.  The claims in the Oklahoma action mirror those later raised in Cowboy's counterclaim in this case – that Lincoln committed fraud, acted in bad faith, and breached the Policies because it did not honor Cowboy's demand that Lincoln cancel the Policies and return all premiums paid on the untenable basis that in 2009 Cowboy could assert a ten-day unilateral right of cancellation.

Cowboy also argues that Lincoln has not been harmed by Cowboy's actions.  *See* Cowboy's Brief, p. 24.  However, Cowboy cannot dispute that the proximate cause of this litigation, and of the fees and expenses incurred by Lincoln, was Cowboy's demand to cancel the Policies in 2009 and its continued adherence to that misplaced position.  *See* Nichols Declaration.

### F.   Pickens is not entitled to summary judgment on Lincoln's tortious interference claim against him.

Pickens makes a cursory attempt to argue that Lincoln's tortious interference claim against him fails as a matter of law.  As with Lincoln's breach of contract claim against Cowboy, Pickens makes the misplaced argument that Cowboy did not breach the Policies, and thus Pickens did not interfere with those contracts, and that Lincoln suffered no harm.

In any event, tortious interference does not require finding an actual breach of contract.  *See Seelbach v. Clubb*, 7 S.W.3d 749, 757 (Tex. App. Texarkana 1999) ("Contractual interference encompasses actual inducement or procurement of a contract breach and all other invasions of contractual relations.  Accordingly, such interference includes any act which retards,

makes more difficult, or prevents performance."). Instead, the elements are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; and (3) actual damages proximately caused by the intentional act. *Id.* "Once the plaintiff establishes a *prima facie* case of tortious interference, the defendant can prevail only by proving his act was either justified or privileged." *Id.*

Although Pickens does not couch his argument as such, he seems to contend that he was somehow justified to interfere with the Policies because he is a member of Cowboy's board of directors. Indeed, according to his conclusory argument, "Pickens was required to advise Cowboy on business matters." It thus appears to be Pickens' position that he was acting as Cowboy's agent, and he can only be liable for tortious interference if it is proven that he was acting to serve his own personal interests at the expense of Cowboy. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 457 (Tex. 1998) (if defendant proves a corporate officer's acts are those of the corporation, and thus the officer was acting as an agent of the corporation, the plaintiff must show that the agent acted in his own interests in order to recover for tortious interference).

However, Pickens has not met his burden of putting forth uncontroverted evidence that he was acting as Cowboy's agent when he pressured Cowboy to demand the cancellation of the Policies and return of premiums. And even if one was to assume that Pickens was Cowboy's agent in this regard, he has also failed to set forth uncontroverted evidence that he did not act in a manner that advanced his own personal interests over those of Cowboy. These issues are quite obviously factual ones that can only be resolved by the jury.

Indeed, although it is undisputed that Pickens is not a party to the Policies, the parties dispute Pickens' involvement and motive with respect to forcing Cowboy to seek cancellation of the Policies. The evidence is that Pickens had his own personal financial stake in the Policies

and the overall insurance program.  *See* App'x, pp. 573-574, Pickens Dep., pp. 123:23-125:17.

Indeed, the Policies were the brainchild of Pickens.  *See* App'x, pp. 568-569, Pickens Dep., pp.

7:20-8:13.

Pickens and Cowboy claim that in late summer 2005, Glenn Turner ("Turner") and Lee

initiated discussions with them regarding a financial strategy for the benefit of "student athletes

and the athletics programs" at OSU.  The program was marketed under Pickens' name, with

Pickens repeatedly taking credit for having developed it.  *See* App'x, pp. 581-584, The First

Billion Is the Hardest, Cowboy Gift of a Lifetime Recognition.  Indeed, as early as November

21, 2005, a presentation titled "Pickens Financial Strategy for Oklahoma State University

Foundation" was created, and it detailed a plan to purchase 35 life insurance policies, each for

$10 million, on the lives of "celebrity alumni" of OSU.  *See* App'x, pp.585-590, Pickens

Financial Strategy for Oklahoma State University Foundation.  In March 2006, another

presentation, titled "Pickens Athletic Development Strategy for Oklahoma State University

Foundation," was created and it repeatedly referred to the program as the "Pickens Athletic

Development Strategy."  *See* App'x, pp. 591-598, Pickens Athletic Development Strategy for

Oklahoma State University Foundation.  In June 2006, a third presentation titled the "Oklahoma

State University Foundation Pickens Insurance Strategy Questions & Answers" was circulated.

*See* App'x, pp. 599-613, Pickens Insurance Strategy Questions & Answers.  And when the

program was announced publicly, a press conference was held where Pickens was hailed a hero.

A plaque was even dedicated in honor of the program, and it hangs today in the Gallagher-Iba

Arena at OSU, with the title: "Cowboy Gift of a Lifetime . . . A Program Created by T. Boone

Pickens."  *See* App'x, pp. 583-584, Cowboy Gift of a Lifetime Recognition.

The program, dubbed the "Gift of a Lifetime," called for the purchase of large insurance policies on the lives of individual supporters of OSU.  OSU, through Cowboy, would be named the owner and beneficiary of the Policies, and it would pay all associated premiums.  When a death claim accrued, Cowboy would use the proceeds to fund other premiums and to benefit OSU athletic programs.  Pickens was so bullish on his Program that he was already charting the various universities and other charitable institutions to which he would sell it.  *See* App'x, p. 577, Pickens Dep., p. 153:15-18; *see also* App'x, p. 614, Prospects for ICEP.

The evidence establishes that Cowboy was acting at the complete direction and control of Pickens.  Even though Cowboy and Pickens now claim a key element of Pickens' Program was long-term premium financing, the evidence proves that contrary to the interests of Cowboy, Pickens pressured the Brokers and Cowboy to consummate Pickens' Program without having obtained such financing so that Pickens could package and sell his Program to the Reagan National Library and other charitable institutions.  *See* App'x, pp. 570-572, Pickens Dep., pp. 26:8-28:21.

The documents produced in this case show that Pickens was effectively the alter ego of Cowboy, and that the story actually begins in December 2005, when Pickens donated $165 million to the predecessor of Cowboy for the purpose of a massive expansion of the OSU athletic facilities.  Because of the gift, OSU renamed its football stadium after Pickens, and Pickens began exercising control.  By all accounts, Pickens had a very close relationship with Holder, and his gift to OSU was contingent on Holder being made athletic director.  *See* App'x, p. 615, Stillwell Dep., p. 35:4-12.  In turn, Holder invested the entire gift in BP Capital, an investment fund run by Pickens.  *See* App'x, pp. 615-616, Stillwell Dep., pp. 35:20-36:2.  Although Pickens

apparently did not charge fees to manage the money, BP Capital nonetheless benefitted by the huge investment into its fund.

According to Pickens' autobiography, he came up with the idea to use life insurance as a means to further fund OSU's athletic programs. *See* App'x, pp. 581-582, The First Billion Is the Hardest. He took the idea to his associate at BP Capital, Bob Stillwell, who in turn hired Turner and Lee as consultants to help develop Pickens' Program. *See* App'x, pp. 568-569, Pickens Dep., pp. 7:20-8:13. They then took the Program to Holder and Cowboy. *See* App'x, pp. 620-622, Holder Dep., pp. 66:21-68:23; s*ee also* App'x, pp. 585-590, Pickens Financial Strategy for Oklahoma State University Foundation. Meanwhile, Lee and Turner were attempting to secure financing through Wells Fargo. *See* App'x, pp. 618-619, Stillwell Dep., pp. 150:1-151:14. The financing was to be collateralized by Cowboy's assets, which consisted of Pickens' $165 million contribution invested with BP Capital. However, while negotiations were underway with Wells Fargo, Cowboy used the same collateral to enter into a separate construction loan with Bank of America. *See* App'x, p. 623, Holder Dep., p. 121:3-15. This apparently limited Cowboy's premium financing opportunities. Nonetheless, Pickens exerted great pressure on Turner and Cowboy to move forward with the Program because Pickens was set to have a meeting with the Reagan National Library in February 2007 and wanted the Program closed before then. *See* App'x, p. 617, Stillwell Dep., p. 116:2-5 In short, Pickens and all involved (except Lincoln) knew that premium financing was not in place, but Pickens forced Cowboy to close on the Program and purchase the Policies anyway. *See* App'x, pp. 624-626, Holder Dep., pp. 145:10-147:4; s*ee also* App'x, pp. 627-632, correspondence from R. Stillwell dated February 8, 2007.

In the months following the issuance of the Policies, Wells Fargo was prepared to offer financing, but Cowboy, acting at the direction of Pickens and BP Capital, decided not to move

forward with a loan.  *See* App'x, pp. 633-634, correspondence from G. Turner dated April 4,

2007.  Among other things, Cowboy did not want to move its investment away from BP Capital,

Pickens' investment fund.  That decision proved devastating, because in early 2008 Cowboy lost

more than $200 million through its investments with BP Capital.  *See* App'x, p. 576, Pickens

Dep., p. 139:5-9.  This left Cowboy effectively insolvent, causing Pickens to set in motion a

scheme to interfere with the Policies by concocting the delivery story and demanding that

Lincoln rescind all coverage and return Cowboy's premium payments.  At least part of the

motivation behind this scheme was to repay a short-term loan that Pickens had personally

guaranteed through Stillwater National Bank and which had been used to pay some of the

premiums.  *See* App'x., p. 635, correspondence from R. Stillwell dated January 26, 2009.

    Accordingly, based on this evidence, a jury could reasonably conclude that Pickens was

not the agent of Cowboy and that he acted without privilege or justification when he willfully

and intentionally interfered with the Policies.  Furthermore, a jury could also reasonably

conclude that to the extent Pickens acted in his capacity as an agent for Cowboy, Pickens acted

in a manner to serve his own personal interests at the expense of Cowboy, and thus acted without

privilege or justification when he willfully and intentionally interfered with the Policies.

### G.    Cowboy is not entitled to summary judgment on Lincoln's declaratory judgment claim.

    Lincoln seeks a declaration that goes right to the heart of the controversy at issue in this

litigation – that: (1) the Policies are valid and enforceable; and (2) Cowboy has no right to cancel

the Policies or obtain a refund of premiums paid under the long-expired ten-day free-look period.

Yet, Cowboy argues that Lincoln's declaratory judgment claim fails because Cowboy has since

alleged counterclaims, and that this somehow means there is no longer an actual controversy

between the parties and that Lincoln is merely seeking relief for "past wrongs." *See* Cowboy's Brief, p. 27. Cowboy's argument completely lacks merit.

Cowboy correctly states that standing for purposes of a claim under 28 U.S.C. § 2201-2202 requires "actual present harm or a significant possibility of future harm," and a showing that an "actual controversy" exists throughout the proceeding. *See, e.g., Bauer v. Texas*, 341 F.3d 352, 357-58 (5th Cir. Tex. 2003). Cowboy also correctly points out that where a party has suffered nothing more than a "past wrong," and there is no present controversy or significant likelihood of future harm, jurisdiction is lacking. *See id.*

However, in spite of Cowboy's obvious acknowledgement of a long-standing actual controversy between itself and Lincoln as to whether the Policies are valid and whether Cowboy has the right to now enforce the ten-day free-look period, Cowboy suggests that Lincoln's claims seek redress for a past wrong that has not manifested into a continuing controversy. This claim is puzzling and is not supported at all by *Bauer*, the single case cited by Cowboy.

In *Bauer*, the plaintiff requested a declaratory judgment that a Texas guardianship statute was unconstitutional. 341 F.3d at 357-58. However, there were no guardianship proceedings pending at the time of the lawsuit, and the plaintiff merely alleged that standing was conferred because the "past pattern of conduct [of the probated judge] demonstrates a threat that he will continue to apply unconstitutional guardianship statutes against Bauer unless declaratory relief is obtained." *Id.* at 357. Because there was no controversy or substantial likelihood of future harm, the plaintiff lacked standing to raise a declaratory judgment claim. *Id.* at 358.

The facts of *Bauer* are a far cry from the facts of this case. Here, the controversy between Lincoln and Cowboy rose to such a level that the parties initiated litigation against each other, each taking the opposite view as to the validity of the Policies. While the genesis of the

claims by and between Lincoln and Cowboy was Cowboy's demand that Lincoln invalidate the

Policies and return all premiums paid at Cowboy's whim, the simple fact that this event triggered

the present controversy does not, of course, mean that no controversy exists.  Cowboy's

argument is entirely illogical, is contradicted by Cowboy's own pleadings and claims which

establish the existence of an actual controversy, and should be rejected out of hand by this Court.

**III.    CONCLUSION**

      For each of the foregoing reasons, Cowboy's and Pickens' motion should be denied.

Dated: <u>February 17, 2012</u>          Respectfully submitted,

                          By: <u>s/ Charles J. Vinicombe</u>
                             DRINKER BIDDLE & REATH LLP
                             Stephen C. Baker
                             PA Bar No. 32326
                             Charles J. Vinicombe
                             NJ Bar No. 00640-1990
                             NC Bar No. 14342
                             Gregory J. Star
                             PA Bar No. 89389
                             Grant E. Nichols
                             PA Bar No. 94837
                             One Logan Square, Suite 2000
                             Philadelphia, PA 19103-6996
                             (215) 988-2700
                             (215) 988-2757 (FAX)

                             Andrew G. Jubinsky
                             State Bar No. 11043000
                             Raymond E. Walker
                             State Bar No. 24037663
                             FIGARI & DAVENPORT, LLP
                             3400 Bank of America Plaza
                             901 Main Street
                             Dallas, Texas 75202
                             (214) 939-2000
                             (214) 939-2090 (FAX)

                             ATTORNEYS FOR PLAINTIFF,
                             THE LINCOLN NATIONAL LIFE
                             INSURANCE COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I certify that all attorneys deemed to accept service of the above-referenced document electronically will be notified via the Court's CM/ECF system on this 17th day of February 2012.


s/ Grant E. Nichols