IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>    *Plaintiff,*<br><br>v.<br><br>COWBOY ATHLETICS, INC. and T. BOONE PICKENS,<br><br>    *Defendants,*<br>─────────────────────<br>COWBOY ATHLETICS, INC. and T. BOONE PICKENS,<br><br>    *Counterclaimants,*<br><br>v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>    *Counterdefendant,*<br>─────────────────────<br>COWBOY ATHLETICS, INC. and T. BOONE PICKENS,<br><br>    *Third-Party Plaintiffs,*<br><br>v.<br><br>MANAGEMENT COMPENSATION GROUP•LEE INC.; JOHN RIDINGS LEE; JOHN RIDINGS LEE COMPANY, INC.; JAMES GLENN TURNER, JR.; LARRY ANDERS; SUMMIT ALLIANCE FINANCIAL, LLP.,<br><br>    *Third-Party Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. 3-10-CV-173-P |

**ORDER**

Now before the Court are: (a) Plaintiff Lincoln National Life Insurance Company's ("Lincoln") Motion for Summary Judgment [doc. 160]; (b) Third Party Defendants Management Compensation Group•Lee, Inc., John Ridings Lee, John Ridings Lee Company, Inc.'s (collectively "Lee") Motion for Partial Summary Judgment [doc. 162]; (c) Third Party Defendant James Glenn Turner, Jr.'s ("Turner") Motion for Summary Judgment [doc. 164]; (d) Defendants Cowboy Athletics, Inc.'s ("Cowboy") and T. Boone Pickens ("Pickens") Motion for Partial Summary Judgment [doc. 166]; and (e) Third Party Defendants Larry Anders and Summit Alliance Financial, LLP's (collectively "Anders") Motion for Summary Judgment [doc. 170], all filed on January 27, 2012.  Responses were filed on February 17, 2012.  (Docs. 189, 191, 194, 180, 195 respectively.)  Replies were filed on March 3, 2012.  (Docs. 204, 205, 207, 206, 209 respectively.)  After reviewing the parties' briefing, the evidence, and the applicable law, the Court:

> (a) GRANTS Lincoln's Motion [doc. 160];
> (b) GRANTS Lee's Motion [doc. 162];
> (c) GRANTS Turner's Motion [doc. 164];
> (d) GRANTS in part and DENIES in part Cowboy's Motion [doc. 166];
> (e) GRANTS Ander's Motion [doc. 170]; and
> (f) GRANTS *sua sponte* Lincoln's declaratory judgment claim.

## I.    Background[1]

Ostensibly, this case revolves around a single question: did Cowboy receive twenty-seven life insurance policies (the "Policies") issued by Lincoln in February 2007?  However, as one delves deeper into the factual allegations in this case, the intrigues become much more apparent. The Court begins with a concise version of the facts.

---

[1] The factual background is taken from the parties' Motions for Summary Judgment, Lincoln's Amended Complaint, and Cowboy's Counterclaims.  (Docs. 5, 44, 160, 162, 164, 166, 170.)

During several meetings from 2005 to 2007, combinations of Cowboy representatives, Pickens, Lee, Turner, and Anders[2] developed a program they called The Gift of a Lifetime (the "Program") designed to raise funds to finance Oklahoma State University's ("OSU") athletic department. The Program was based on the purchase of life insurance policies (the "Policies") whereby OSU solicited alumni donors aged 65 to 85 to allow Cowboy to purchase $10 million life insurance policies on their lives with Cowboy as the beneficiary. Under the Program, an annual $16 million premium payment for the Policies would be covered by a premium finance loan, which in turn would be repaid using the death benefits from the Policies with the excess of any such benefits becoming a stream of future income to Cowboy of somewhere between $100 million and $350 million. This projected stream of income was supported by actuarial analysis including mortality rates and illustrations provided by the Brokers. The Brokers arranged and completed Cowboy's applications for the Program and acted as a liaison between Cowboy and the insurance company Lincoln.

Sometime in February of 2007, Lincoln issued the Policies on the lives of twenty-seven OSU donors to Cowboy as part of the Program. Each of the Policies contained a free look provision which allowed Cowboy ten days to return the Policies to Lincoln for any reason. Lincoln required physical delivery of the Policies by the Brokers to the insured to ensure that Lincoln complied with Oklahoma law. Lincoln delivered the Policies to Lee with the intention that either Lee or Turner would make delivery to Cowboy,[3] however, Lee never physically delivered the Policies to Cowboy. On February 9, 2007, Lee faxed the President of Cowboy and

---

[2] Third Party Defendants are collectively referred to as the Brokers.

[3] Lee or Turner, as sales agents for Lincoln, were allegedly supposed to deliver the Policies to Cowboy. Anders and Summit, as the general agent for Lincoln, were allegedly supposed to serve as the intermediary between the insurance company and the independent retail sales agents. (Doc. 170-1 at 9-10.)

OSU Athletic Director J. Mike Holder ("Holder") Policy Delivery Receipts indicating that Cowboy had physically received the Policies. Lee allegedly instructed Holder to sign the forms and fax them back to Lee. Holder, without reading the Policy Delivery Receipts, signed and faxed all twenty-seven of the forms back to Lee. After receipt of the executed Policy Delivery Receipts, Lee returned them to Lincoln via Anders. Both Cowboy and the Brokers concede that the Policies were never physically delivered to Cowboy in 2007.

During the time period of February 9, 2007 until January 2009, Cowboy paid approximately $33 million in premium payments under the Policies and was facing an additional annual $16 million premium payment in February of 2009. Because none of the insureds had died, Cowboy was facing continued premium payments without any offsetting death benefits. In January 2009, OSU President Burns Hargis ("Hargis") asked an alumnus in the insurance industry to look into the Policies and their underlying financial structure. After several requests for the Policies were made to the Brokers, the Policies were provided to Cowboy around March 24, 2009. On April 3, 2009, within ten days of physically receiving the Policies, Cowboy requested that Lincoln cancel the Policies under the free look provision and return all premium payments. As of that point, Cowboy has not made any subsequent premium payments.

## II.  Legal Standard & Analysis

### A. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an

absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Celotex*, 477 U.S. at 323. However, all evidence and reasonable inferences to be drawn there from must be viewed in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party defending against the motion for summary judgment cannot defeat the motion, unless he provides specific facts demonstrating a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *See id.* at 249-50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Further, a court has no duty to search the record for evidence of genuine issues. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). It is the role of the fact finder, however, to weigh conflicting evidence and make credibility determinations. *Liberty Lobby*, 477 U.S. at 255.

### B. Analysis

Cowboy, Lincoln, Lee, Anders, and Turner filed cross-motions for summary judgment that cover the same legal issues and factual allegations. The Court notes that the parties did not

follow Local Rules 56.5-6 in regard to briefing length or summary judgment appendices. A reply is intended to allow the movant to respond to the non-movant's arguments not as a platform for new arguments. Additionally, because the parties did not follow the local rules regarding appendices, the Court was required to decipher individualized formats and citations to several thousand pages of appendices within hundreds of documents. The Court strongly recommends that the parties re-read and comply with the local rules before submitting any further motions or briefing. Any briefing not in compliance with the Local Rules is subject to being stricken.

### 1. Cowboy's Claim of Breach of Contract by Lincoln

In order to prove breach of contract, a plaintiff must show: "(1) the formation of a contract; (2) a breach thereof; and (3) actual damages suffered from that breach." *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001). Cowboy alleges that Lincoln breached by failing to timely deliver the Policies to Cowboy when they were issued in 2007 and by refusing Cowboy's request to cancel the Policies and refund all premiums paid on April 3, 2009. (Doc. 44 at 50-51.) The central question in this case is: when did Cowboy receive the Policies thus triggering the ten day free look period and right to cancel? Section 4003.1 of the Oklahoma Insurance Code states:

> No policy of individual life insurance or any annuity shall be delivered or issued for delivery in this state unless it shall have printed thereon or attached thereto a notice stating in substance that, during a period of ten (10) days *from the date the policy or annuity is delivered to the insured*, it may be surrendered to the insurer together with a written request for cancellation of the policy or annuity and, in such event, the policy or annuity shall be void from the beginning.

Okla. Stat. tit. 36 § 4003.1 (emphasis added). Consistent with the statutory requirements, the Policies define the Right to Examine as:

You may return this Policy for any reason to the Insurance agent through whom it was purchased or to us [Lincoln] at the address listed above within 10 days *after its receipt*[.]  If returned, this policy will be considered void from the Policy Date and we will refund the premium paid less any prior loans, unpaid loan interest, and partial surrenders.

(Doc. 167-1 at 2 (emphasis added).)

Cowboy argues that Lincoln was required to physically deliver the Policies to Cowboy for the free look period to begin based on public policy and Lincoln's internal firm guideline. (Docs. 166-1 at 9-11, 22; 168-1 at 15-16; 190 at 15.)  However, neither the statute nor the Policies themselves specify the type of delivery that must occur or whether physical delivery is required.  (Docs. 190 at 18; 167-1 at 2.)  Additionally, the relevance of Lincoln's internal guideline to the interpretation of an insurance contract is unclear as it is extrinsic to the Policies and there is no evidence that Cowboy knew of the guidelines at the time the Policies were issued.

At the same time, Holder signed twenty-seven Policy Delivery Receipts when the Policies were issued which state:

> *I acknowledge physical receipt and acceptance of the above policy.  I further agree that ... insurance will take effect under the Policy only when: (1) the Policy has been delivered to and accepted by me; and (2) the initial premium has been paid in full during the lifetime of the Proposed Insured(s).*  I understand that I have a period of time in which to thoroughly examine this Policy.  If I should decide the Policy is not acceptable, I can return the Policy to [Lincoln] for a refund.  To exercise this right, I understand that the Policy must be returned no later than the last day of the 'right to examine' period as described in the Policy...If I give this Policy to anyone before the 'right to examine' period has expired, I agree that I have completed my examination of the Policy and found it to be acceptable.

(Doc. 161-3 at 2 (emphasis added).)  Wholly contradictory to the signed Policy Delivery Receipts, Cowboy now claims that the Policies were not physically delivered until March 24, 2009 and that Holder signed the documents falsely.  (Docs. 161-4 at 25-27; 166-1 at 12-13.) Holder testified in his deposition that the Delivery Receipts were false because Lee retained

possession of the Policies and that Cowboy never asked for the Policies. (Doc. 161-4 at 26-27.) Holder also testified that Lee suggested that the Policies be retained in Lee's office and Holder agreed. (Doc. 161-4 at 26-27.) Lee testified that he believed that the Delivery Receipts were correct because Cowboy gave Lee permission to hold onto the Policies and that if Holder or Cowboy had ever asked, he would have given the Policies to them. (Docs. 161-4 at 25-27; 181-1 at 2-3.) Holder admitted that Cowboy could have obtained the Policies from Lee at any time, but simply chose not to until 2009. (Doc. 161-4 at 23, 25-27.)

Neither Lee nor Cowboy told Lincoln that the Policy Delivery Receipts were falsely signed at the time the Policies were issued and there is no evidence that Lincoln had any knowledge that the representations made by Lee and Cowboy were false until 2009. (Docs. 161-2 at 2; 161-4 at 23; 161-5 at 4-5; 180 at 19.) Despite providing false information in the Delivery Receipts, both Lee and Holder testified that they believed that the Policies went into effect when Cowboy signed the Delivery Receipt. (Docs. 161-4 at 23, 25-27; 161-1; 161-15; 181-1 at 2-3.) Additionally, Helena Roberts stated that the signing of a delivery receipt triggers the free look period. (Docs. 161-5 at 3; 181-2 at 3-4.) Both Lincoln and Cowboy treated the Policies as valid and fully performed from the 2007 issuance date as evidenced by the facts that (a) Cowboy paid premiums and (b) Lincoln issued Annual Policy Statements for approximately two years until 2009. (Docs. 161-4 at 23, 25-27; 161-1; 161-15; 181-1 at 2-3.) Holder and others at Cowboy testified that had an insured died during this two year window, Cowboy would have submitted a death claim and expected it to have been paid by Lincoln. (Docs. 161-4 at 44-45; 161-10 at 8; 161-11 at 9.)

Oklahoma recognizes constructive delivery where an insurer has mailed the policy to its agent rather than the insured, the first premium has been paid, and the application approved.

*Mid-Continent Life Ins. Co. v. Dees*, 269 P.2d 322, 323 (Okla. 1954); *see Tillman ex. Rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1303-04 (10th Cir. 2005); *Keirsey v. Banner Life Ins. Co.*, 107 Fed. App'x 847, 850 (10th Cir. 2004). Equitable estoppel requires a claimant to show: "(1) the party to be estopped knows the facts and intends that his conduct be acted upon; and (2) the party asserting estoppel is ignorant of the true facts and relies upon the other party's conduct to its detriment." *Penny v. Giuffrida*, 897 F.2d 1543, 1545-46 (10th Cir. 1990).

Based on the parties' briefing, the evidence, and the applicable law, the Court finds that the Policies were constructively delivered at the time Holder signed the Policy Delivery Receipts and Cowboy is estopped from claiming otherwise.[4] Holder admitted signing, without reading, Policy Delivery Receipts at the time the Policies were issued, which stated "I understand that I have a period of time in which to thoroughly examine this Policy. If I should decide the Policy is not acceptable, I can return the Policy to [Lincoln] for a refund." (Doc. 161-3 at 2.) The Policy Delivery Receipts also stated that the insurance would only take effect if the Policy had been delivered and accepted and the initial premium had been paid. (Doc. 161-3 at 2.) An insured has a duty to examine and read the contents of an insurance policy before accepting and paying a premium and, having failed to do so, it is estopped from denying knowledge of its terms. *Smith v. Baptist Found. of Okla.*, 50 P.3d 1132, 1137-38 (Okla. 2002); *Liverpool & L. & G. Ins. Co. v. T.M. Richardson Lumber Co.*, 69 P. 936, 937 (Okla. 1902). Holder signed the Policy Delivery Receipts acknowledging his free look right and delivery of the Policies. It was Holder's own decision not to read the legal documents he signed and to not read the policies. Based on these

---

[4] In the Court's order regarding Lincoln's Motion to Dismiss, the Court found that constructive delivery did not apply. (Doc. 72 at 9.) However, on a motion to dismiss, the Court takes all the evidence in a light most favorable to the nonmovant. *See Iqbal v. Ashcroft*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009). At the summary judgment stage, the parties have had time to conduct discovery and the Court bases its judgment on the actual evidence presented, not plausible factual allegations. Fed. R. Civ. P. 56(c).

documents, both Lincoln and Cowboy subsequently treated the issued Policies as valid and they both performed under the contracts. For Cowboy to now claim breach of contract based on an alleged failure of delivery of the Policies would itself be inequitable.

The Court finds that Holder was put on notice regarding his right to free look period and the amount of time he had to return the Policies when he signed the Policy Delivery Receipts. While Lee held on to the Policies, both Holder and Lee admit that Holder had access to the Policies and could have asked for them at any time—which Cowboy eventually did in 2009. Constructive delivery cannot be found where policies delivered to an agent are alleged to have been concealed by that agent from the insured. (Doc. 72 at 8-9.) However, Holder: (a) knew he did not physically receive the Policies, (b) signed Policy Delivery Receipts acknowledging physical delivery and his free look right, (c) acknowledges he had access to the Policies at any time, and (d) fully performed under the terms of the Policies. Lincoln relied upon the Policy Delivery Receipts in performing under the Policies. Therefore, the Court finds that the Policies were constructively delivered in 2007 and Cowboy is estopped from claiming otherwise.

The Court also finds that the signed Policy Delivery Receipts and Cowboy's treatment of the Policies, taken together, serve as a waiver of its free look right. "Waiver is the voluntary, intentional relinquishment of a known right. The person against whom waiver is asserted as a defense must have had full knowledge of the existence of his rights as well as of all the material facts upon which those rights depend." *Silver v. Slusher*, 770 P.2d 878, 883 n.12 (Okla. 1988). While Cowboy argues that Lee instructed Holder to simply sign the Policy Delivery Receipt forms and fax them back to him [doc. 190 at 19], Cowboy had full knowledge of the existence and application of its free look right based on Holder's signature of the Policy Delivery Receipts. Cowboy again argues that Lincoln's internal guidelines do not allow for waiver of physical

delivery [doc. 190 at 18] but, again, there is evidence that Lee, Holder, and Cowboy were complicit in providing false information to Lincoln regarding whether physical delivery had occurred at the time the Policies were issued. There is also evidence that if Lee or any other agent had requested Lincoln waive physical delivery, Lincoln would have refused. (Doc. 168-1 at 41, 54-57.) Therefore, the Court finds that Cowboy waived its free look right.

The Court finds that Cowboy's breach of contract fails as a matter of law. Holder signed Policy Delivery Receipts acknowledging: (a) Cowboy's free look right and (b) that Cowboy received the Policies. This triggered the ten day free look period. While Cowboy argues that physical delivery would prevent the type of mischief that Lee committed here [doc. 190 at 17], Holder and Cowboy created the instant mischief themselves by failing to read legal documents before signing them and electing not to take physical delivery of the Policies. Physical delivery is irrelevant in this case because Cowboy would have continued to pay premiums under either scenario. Based on the evidence provided in the record, the parties' briefing, and the applicable law, the Court finds that Lincoln's Motion for Summary Judgment is GRANTED and Cowboy's Motion for Partial Summary Judgment is DENIED in regard to Cowboy's breach of contract claim.

## 2. Cowboy's Claim of Breach of Duty of Good Faith by Lincoln

Cowboy also alleges that Lincoln breached its duty of good faith and fair dealing by: (a) failing to timely deliver the Policies in 2007; (b) failing to conduct reasonable underwriting; and (c) refusing to cancel the Policies in 2009. As the Court has already found, Lincoln had no duty to provide underwriting services to Cowboy under the duty of good faith and fair dealing because it predated the actual contractual relationship. (Doc. 72 at 10 (*citing Goodwin v. Old Republic Ins. Co.*, 828 P.2d 431, 433 (Okla. 1992).) As discussed above, the Court finds that

Lincoln did not breach the Policies in 2007 and, therefore, Lincoln necessarily could not have breached in 2009 by refusing to cancel the Policies. Based on the evidence provided in the record, the parties' briefing, and the applicable law, the Court finds that Lincoln's Motion for Summary Judgment is GRANTED in regard to Cowboy's Breach of Duty of Good Faith claim.

### 3. Lincoln's Claim of Breach of Contract by Cowboy

Lincoln argues that Cowboy breached the Policies by attempting to cancel them in 2009 and requesting a refund of premium payments. (Doc. 5 at 18.) As discussed above, Cowboy received the Policies in 2007 and attempted to cancel them in 2009. Under the Policies, Cowboy had a right to cancel or surrender the Policies at any time. (Doc. 167-1 at 16, 33-36.) Lincoln does not identify a contract term that was breached by Cowboy's request to cancel. Lincoln also argues that it suffered damages in the form of the instant lawsuit, but it cites no authority in support. Based on the evidence provided in the record, the parties' briefing, and the applicable law, the Court finds that Cowboy's Motion for Partial Summary Judgment is GRANTED in regard to Lincoln's breach of contract claim.

### 4. Lincoln's Claim of Tortious Interference by Pickens

Lincoln next claims that Pickens tortuously interfered with the Policies and the parties' performance under the Policies. Under Oklahoma law, a tortious interference claim requires a plaintiff to prove that: (1) it had a business or contractual right with which there was interference; (2) the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and (3) damage was proximately sustained as a result of the complained-of interference. *Wilspec Techs., Inc. v. DunAn Holding Grp. Co., Ltd.*, 204 P.3d 69, 74 (Okla. 2009). "Additionally, the claim is viable only if the interferor is not a party to

the contract or business relationship." *Id.* Lincoln concedes that Pickens was the alter ego of Cowboy and that Cowboy acted at his complete direction and control. (Doc. 180 at 26.)

Assuming, in arguendo, that Pickens was a third party capable of tortious interference, the Court finds that Lincoln has not sufficiently supported its claim. Lincoln claims that Pickens had a personal financial stake in the Policies and that he "concoct[ed] the delivery story and demand[ed] that Lincoln rescind all coverage and return Cowboy's premium payments." (Doc. 180 at 28.) There is evidence that Pickens: (a) individually guaranteed part of the Program, (b) was concerned about his investment, and (c) pressured both Cowboy and the Brokers to get a deal done regardless of whether premium financing was in place. (Docs. 162-2 at 57, 85; 181-16 at 2.) Lincoln argues that Pickens had motive not to move forward with a capitalization loan for the Program, but it provides no evidence that Pickens' interference was malicious and wrongful. Without more than conclusory statements and unsubstantiated assertions, Lincoln cannot defeat Cowboy's Motion for Summary Judgment. *See Douglass*, 79 F.3d at 1429. Therefore, the Court GRANTS Cowboy's Motion for Partial Summary Judgment in regard to Lincoln's tortious interference claim.

### 5.  Cowboy's Claims of Fraud, Negligence, and Negligent Misrepresentation Against Lincoln and the Brokers

Cowboy also alleges fraud, negligence, and negligent misrepresentation based on the allegedly fraudulent Program the Brokers, acting as Lincoln's agents, sold to Cowboy.[5] (Doc. 44 at 51-53, 55-57.) A claim of negligence requires the plaintiff to show: (1) a duty of care owed by

---

[5] The Court notes that Cowboy's arguments rely on the allegation that Lincoln and Anders are liable for the acts of their agents, namely, the Brokers. The general rule in agency law is that a contract made with a known agent for a disclosed principal is a contract with the principal alone. *Slover v. Equitable Variable Life Ins. Co.*, 443 F.Supp.2d 1272, 1280 (N.D. Okla. 2006); *Moran v. Loeffler-Greene Supply Co.*, 316 P.2d 132, 134 (Okla. 1957). "[T]he knowledge of the agent will generally be imputed to the principal who will be liable for the agent's actions." *State ex rel. Fisher v. Heritage Nat'l Ins. Co.*, 146 P.3d 815, 819 (Okla. Civ. App. 2006) (internal citations omitted).

defendant to plaintiff; (2) defendant's breach of that duty; and (3) injury to plaintiff caused by defendant's breach of that duty. *Berman v. Lab. Corp. of Am.*, 268 P.3d 68, 72 (Okla. 2011).  An insurance agent has a duty to act in good faith and use reasonable care, skill, and diligence in the procurement of insurance and that duty is breached when insurance is not procured as promised due to fault by the agent. *Swickey v. Silvey Cos.*, 979 P.2d 266, 269 (Okla. Civ. App. 1999).  A claim for negligent misrepresentation or fraud based on misrepresentation requires a plaintiff to show that a defendant made a material statement knowing it was false. *Slover*, 443 F.Supp.2d at 1282 (*citing Roberson v. PaimeWebber, Inc.*, 998 P.2d 193, 197 (Okla. Civ. App. 1999)).  Mere opinions regarding future events generally cannot form the basis of a misrepresentation claim. *Hall v. Edge*, 782 P.2d 122, 128 n.4 (Okla. 1989).  However, "[t]he fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge." *Id.* (*quoting Claus v. Farmers & Stockgrowers State Bank*, 63 P.2d 781, 789 (Wyo. 1936)).  On the other hand, "[a]n action for fraud may not be predicated on false statements when the allegedly defrauded party could have reasonably ascertained the truth with reasonable diligence." *Slover*, 443 F.Supp.2d at 1282 (*quoting Bankers Trust Co. v. Brown*, 107 P.3d 609, 614 (Okla. Civ. App. 2004)).

Cowboy first argues that the Program itself was fraudulent and that Brokers misrepresented the evaluation material including the net return on the Policies, when the insureds would die, and the availability of premium financing.[6]  (Doc. 160-1 at 27.)   Contrary to Cowboy's assertion, however, there is evidence that the Program was created by Pickens,

---

[6] Cowboy also argues that the Brokers forged signatures of Cowboy representatives on illustrations that were given to Lincoln but it is unclear what relevance these alleged forgeries have in regard to Cowboy's involvement in the Program and the issuance of the Policies.

Cowboy, and the Brokers. (Doc. 164-5 at 37-41.) Pickens own book states that "[W]e came up with the plan to help OSU through an innovative life insurance plan. [Stillwell] brought [the Brokers] in as consultants to help develop the plan....The plan was to have the athletic foundation pay premiums for ten-million-dollar policies on each individual, with the athletic department as the beneficiary." (Doc. 162-2 at 10.) Additionally, Holder testified that Cowboy has no evidence that the mortality assumptions were knowingly false or that they were based on manipulated information. (Doc. 161-4 at 48-49.) Holder also testified that the Brokers did not lie when they stated that they believed they could obtain financing for the Policies premium payments. (Doc. 160-1 at 28.) From the evidence presented to the Court, it appears that all of the information and opinions provided by the Brokers were in regard to future events which generally may not form the basis for a fraud claim. *See Hall*, 782 P.2d at 128 n.4.

The Court turns to whether the statements involved a matter peculiarly within the Broker's knowledge. While Cowboy argues that the knowledge regarding the benefit matrices, cash flow, and mortality assumptions was in the sole possession of the Brokers and not discoverable by Cowboy, there is evidence that Cowboy investigated the underlying statistics, reviewed the Broker's proposals, and attempted to confirm the legitimacy of the Program.[7] (Docs. 161-9 at 2; 181-13 at 7; 162-6 at 52-54; 162-8 at 32.) The OSU Foundation[8] Investment Committee, chaired by Cowboy board member John Clerico, retained One Advocate Group to evaluate the Program and provide a due diligence report which contained recommendations on the life expectancy rates and premium financing issues. (Docs. 162-7 at 15-21; 170-2 at 381;

---

[7] This included input from (a) Bryan Clark, an advisor to Pickens, (b) Burns Hargis, (c) Kirk Jewell, and (d) Ross McKnight.

[8] The OSU Foundation holds Cowboy's funds until they are requested.

170-3 at 64-81; 181-8 at 1-7.)  Holder also attended at least one meeting where Lee and Turner

answered questions from One Advocate Group regarding the Program.  (Doc. 162-3 at 36-51.)

Holder and Cowboy knew sometime before the Policies issued that the availability of

premium financing would play a major role in whether the Program would function properly.

(Doc. 162-2 at 85.)   Cowboy also knew that long-term premium financing as originally

represented would not be available due to Cowboy's use of collateral in other secured

transactions.  (Docs. 164-3 at 29; 164-4 at 71-80; 164-5 at 37-41.)  At the time the Policies were

issued, the Brokers made it clear to Cowboy that premium financing was not in place and that

Cowboy was taking a risk in proceeding with the Program without it.  (Docs. 162-7 at 36; 162-9

at 33-35; 170-2 at 448-49, 477-78; 170-3 at 97-98.)  The Brokers warned Cowboy about the

inherent risk in proceeding with the Program without premium financing but Cowboy apparently

chose to pursue its own financing.  (Docs. 162-2 at 59-64, 72-73; 162-6 at 16; 162-9 at 33-35;

170-3 at 117-119, 121, 123.)  At the same time, Pickens was pressuring both Cowboy and the

Brokers to get a deal done regardless of whether premium financing was in place and Holder

knew that the alternative was "Not PrettY [sic]" and that "all our heads will roll" if a deal was

not consummated.  (Docs. 162-2 at 57, 85; 164-4 at 70-71.)  Robert Stillwell[9] admitted that

"every change along the way, beginning with [Cowboy's] inability to make the initial 20 million

deposit for interest payments in early years, started us down the road where, cumulatively, we

weighted down and sunk this program.  Some of it we did ourselves, but some of it was decline

in markets." (Doc. 164-5 at 58.)

The Court finds that the evaluation materials provided to Cowboy were not fraudulent,

negligent, or material misrepresentations because they dealt exclusively with future events and

---

[9] Stillwell is Pickens' attorney, general counsel to BP Capital, and Pickens' "point man" for handling the Program.

opinions. Cowboy not only could have reasonably ascertained the truth regarding the Program—it did. Cowboy performed extensive due diligence through analysis of mortality rates, premium financing options, and other financial statistics related to the Program. Based on all of the information it had at the time, Cowboy chose to proceed despite warnings from its advisors regarding mortality rates and statistical sampling error and warnings from the Brokers concerning the absence of long term financing. Cowboy relied upon its own analysis and due diligence in choosing to forego the Program's originally planned, long term premium financing recommendation. The Policies procured were not those as promised by the Brokers due to Cowboy's and Pickens' own decisions, not those of the Brokers or Lincoln. *See Swickey*, 979 P.2d at 269. Therefore, Cowboy's fraud, negligence, and negligent misrepresentation claims must fail as a matter of law. *See Slover*, 443 F.Supp.2d at 1282; *Berman*, 268 P.3d at 72. As Cowboy's arguments in regard to Lincoln and Anders are solely based on their alleged vicarious liability of the Brokers, Cowboy's claims of fraud, negligence, and negligent misrepresentation against Lincoln and Anders must fail as well. The Court GRANTS Lee, Anders, Turner, and Lincoln's Motions for Summary Judgment as to these claims.

### 6. Cowboy's Equitable Claims of Unjust Enrichment and Rescission

Lincoln and the Brokers also move for summary judgment as to Cowboy's unjust enrichment claims based the Brokers alleged structuring of the Policies so that Cowboy would pay the maximum amount of premiums. "Unjust enrichment is a condition which results from the failure of a party to make restitution in circumstances where not to do so is inequitable, i.e., the party has money in its hands that, in equity and good conscience, it should not be allowed to retain." *Okla. Dep't of Sec. v. Blair*, 231 P.3d 645, 658 (Okla. 2010). Rescission is an equitable remedy for fraud. *A.A. Murphy, Inc. v. Banfield*, 363 P.2d 942, 946 (Okla. 1961). The Court has

found that the Brokers and Lincoln did not commit fraud, negligence, or negligent misrepresentation in regard to the Program. The Policies were constructively delivered to Cowboy in 2007 when Holder signed the Policy Delivery Receipts. By signing these documents, Holder and Cowboy represented to Lincoln that they had received the Policies. Both Lincoln and Cowboy fully performed under the Policies for two years and Cowboy is now estopped from arguing that Lincoln breached. For the same reasons, Cowboy is estopped from arguing that Lincoln was unjustly enriched or seeking rescission of the Policies. Therefore, the Court finds that Lincoln and the Brokers' Motions for Summary Judgment are GRANTED in regard to Cowboy's unjust enrichment and rescission claims.

### 7. Lincoln's Declaratory Judgment Claim

Cowboy next argues that Lincoln's declaratory judgment claim should be denied as untimely and improper. "In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). In *Bauer*, the Fifth Circuit further clarified:

> [t]he 'actual controversy' required under 28 U.S.C. § 2201(a) 'is identical to the meaning of case or controversy for the purpose of Article III…. In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future….Based on the facts alleged, there must be a substantial and continuing controversy between two adverse parties.

*Bauer v. Tex.*, 341 F.3d 352, 357-58 (5th Cir. 2003). "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. Similar reasoning has been applied to suits for declaratory judgment." *Id.* The harm in this case arises out of premium payments made by Cowboy to Lincoln from 2007 to

2009. As the Court discussed above, Cowboy's free look period began in 2007 and it was not entitled to cancel the Policies based on a free look request in 2009. Therefore, Lincoln has a right to the premium payments made by Cowboy in 2007 and 2008 under the Policies.

Based on the evidence provided in the record, the parties' briefing, and the applicable law, the Court finds that Cowboy's Partial Motion for Summary Judgment is DENIED in regard to this claim. Additionally, as both parties have fully briefed and requested summary judgment on the breach of contract issue that forms the basis of Lincoln's claim, the Court GRANTS summary judgment *sua sponte* for Lincoln on its declaratory judgment claim to the extent that: (a) Cowboy's free look period began in 2007, (b) Cowboy was not entitled to cancel the Policies based on a free look period in 2009, and (c) Lincoln is entitled to the 2007 and 2008 premium payments. *See Celotex*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.").

### III.  Conclusion

For the foregoing reasons, the Court:

(a) GRANTS Lincoln's Motion [doc. 160];
(b) GRANTS Lee's Motion [doc. 162];
(c) GRANTS Turner's Motion [doc. 164];
(d) GRANTS in part and DENIES in part Cowboy's Motion [doc. 166];
(e) GRANTS Ander's Motion [doc. 170]; and
(f) GRANTS *sua sponte* Lincoln's declaratory judgment claim.

**IT IS SO ORDERED.**

Signed this ___9th___ day of March, 2012.

Jorge A. Solis

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE